IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2015

## STATE OF TENNESSEE v. LEDERRIUS THOMAS

**Appeal from the Criminal Court for Shelby County**
**No. 12-02647      Chris B. Craft, Judge**

---

**No. W2014-01390-CCA-R3-CD  -  Filed July 28, 2015**

---

Appellant, Lederrius Thomas, was convicted of first degree murder and attempted first degree murder.  The trial court sentenced appellant to life for his first degree murder conviction and to fifteen years for his attempted first degree murder conviction, to be served concurrently.  Appellant now challenges his convictions, arguing that the evidence at trial was insufficient to prove premeditation and that the trial court erred in issuing a supplemental jury instruction regarding the element of premeditation.  Following our review of the parties' briefs, the record, and the applicable law, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Stephen C. Bush, District Public Defender; and Phyllis Aluko (on appeal) and Jim N. Hale, Jr., (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Lederrius Thomas.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Horne Dwyer and Ann Levora Schiller, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case concerns a shooting that occurred after a verbal altercation at a party. Appellant was indicted for the first degree murder of Rickey Mayes and the attempted first degree murder of Tarin Harris.  Appellant's trial began on March 25, 2014.

## I. Facts

Sheila Mayes, Rickey Mayes' mother, testified that her son was sixteen years old when he died and that he was in the eleventh grade at Frayser High School.

Memphis Police Department Officer Jerome Johnson testified that on the night of October 1, 2011, he and his partner responded to a shooting and were the first officers to arrive at the scene. When he arrived, Tarin Harris was standing beside a blue Chevrolet Malibu with multiple bullet holes in it frantically yelling for someone to help his brother who had been shot. At the time, Mr. Harris did not realize that he had also been shot, but Officer Johnson observed the injury and noticed that the back of Mr. Harris's shirt was "completely red." Officer Johnson saw that Rickey Mayes, Mr. Harris's brother, was "lifeless" and was bleeding from the top of his head. Officer Johnson did not see any weapons at the scene.

Demario Watson, a high school teacher, testified that on the night of October 1, 2011, he was hosting a party for his wife, Shontay, and his sister-in-law, Contoyeria.[1] During the party, Mr. Watson learned that a fight was about to occur outside. When Mr. Watson went outside, he saw eight individuals standing close together, and two of the males were arguing. Mr. Watson told the group that they needed to leave, and two of the males got into a blue car. Mr. Watson saw two cars stop in front of the house ― one car was burgundy and the other was silver. Mr. Watson and his wife walked to the cars and told the occupants that the party was over and that they needed to leave. While Mr. Watson was standing beside the burgundy car, the blue car drove by him. Moments later, Mr. Watson heard six to eight shots fired and saw the shooter running behind the blue car. The blue car continued on its course and left the area.

During cross-examination, Mr. Watson explained that after he stopped the argument, one of the young men who had been involved in the argument began talking to the people in the silver car. Mr. Watson clarified that after he finished talking to the males in the burgundy car, the blue car drove past him, and then he heard the first shots fired.

Tarin Harris testified that on the night of October 1, 2011, he, Contrel, Rickey, and "Marco," went to a talent show that ended at approximately 10:30 p.m. After the talent show, Mr. Harris drove the group to Contrel's sister and brother-in-law's home because they were hosting a party. Mr. Harris explained that at the time, Contoyeria was his girlfriend and that he was two years older than she. During the party, Mr. Harris and Contoyeria went outside, and Legarius Hodges, whom Mr. Harris did not know, exited

---

[1] It is the policy of this court to protect the identity of minor witnesses. Accordingly, we will use the first name of any minors and their family members. In doing so, we mean no disrespect.

the house "ranting and raving" while talking on the telephone. Mr. Harris informed other party-goers about Mr. Hodges' actions, and several individuals went outside. Mr. Hodges was overheard saying, "'[E]verybody[,] I got[sic] a surprise for you[.] I've got a surprise for everybody else.'" Mr. Harris explained that he did not have any ill will towards Mr. Hodges at that point and that Mr. Hodges appeared visibly upset. However, shortly thereafter, Mr. Harris learned that Contoyeria and Mr. Hodges had developed a relationship, and he and Rickey left the party.

After leaving, Mr. Harris found that he had left his jacket at the party. Before returning to the party, Mr. Harris picked up Cordarious because he believed that Cordarious and Rickey would "have [his] back." He also called Contrel to determine if Mr. Hodges and his friends had left the party. Mr. Harris asserted that he, Cordarious, and Rickey did not have weapons. After arriving at the party, Mr. Harris went inside, retrieved his jacket, and exited the home. As he was going back down the driveway, Mr. Hodges, Contoyeria, and a group of people were walking up the driveway, and Mr. Hodges acted as if he wanted to fight. Prior to any physical altercation, Mr. Watson intervened and asked what was causing the quarrel. When Mr. Harris asked if Mr. Hodges was dating Contoyeria, Mr. Hodges responded, "'I don't fight over a b***h.'" During this confrontation, Rickey was standing beside Mr. Harris and Cordarious was attempting to calm the situation. After Mr. Hodges' statement, appellant intervened and asked if Mr. Harris wanted to fight Mr. Hodges, to which Mr. Harris responded that it did not matter and that he did not know Mr. Hodges. Contoyeria's mother intervened and told Mr. Harris to either come inside the house or leave the party. Rickey requested that they just leave the party. Accordingly, Mr. Harris and Rickey got in their blue Malibu and began driving down the street, leaving Cordarious at the party. Mr. Harris was driving the car, and Rickey was in the passenger seat. As Mr. Harris drove down the street, appellant began shooting at the car before the car had passed appellant and continued shooting as the car passed him. Mr. Harris explained that when the shooting began, he accelerated, hitting a curb in his attempt to flee the area. Mr. Harris noticed that Rickey was not moving and that Rickey was bleeding. Mr. Harris called 9-1-1, and when the police arrived, one of the officers indicated that Mr. Harris was also injured. Mr. Harris stated that he was shot in the back and "grazed" on the side and that Rickey died as a result of his injuries. Mr. Harris testified that he did not know why appellant shot at them and that other than the argument with Mr. Hodges, he did not have any "other words" with appellant.

During cross-examination, Mr. Harris stated that when Mr. Hodges was on the telephone, he was under the impression that Mr. Hodges was asking someone to come to the party and that the conversation was related to him. Mr. Harris clarified that he was asked to leave the party the first time but that he returned for his jacket. Mr. Harris denied telling Cordarious that someone had just tried to "jump" him or that he was going back to "see what he was going to do." Mr. Harris explained that Cordarious, Rickey,

and "Leon" rode to the party with him and that "Bam," Cordarious' friend, drove to the party in a burgundy car. Mr. Harris stated that when he exited the house with his jacket, Mr. Hodges approached, cursing, but that he did not curse at or act threateningly toward Mr. Hodges in response. Mr. Harris agreed that prior to the shooting, appellant did not yell or threaten anyone. Mr. Harris explained that "Leon" and "Bam" stayed by the car during the altercation.

During redirect examination, Mr. Harris explained that Cordarious, "Bam," and "Leon" all worked at McDonald's and that they had all just gotten off of work and were together when he called Cordarious. Mr. Harris stated that neither "Bam" nor "Leon" were involved in any way and that Cordarious only tried to calm the situation. Mr. Harris explained that he called Cordarious because Cordarious was a "fighter" but that he had no intention of starting an altercation at the party.

Contrel testified that he was seventeen at the time of trial and that he was fifteen at the time of the shooting. On the night of the shooting, Contrel, Mr. Harris, Rickey, and "Marco" went to a talent show in Mr. Harris's blue Malibu and then went to a party at his sister's house. Contrel recalled that Mr. Harris left the party at some point after "a little conflict" with Mr. Hodges and that shortly thereafter, Mr. Harris called Contrel to tell him that he was returning to the party to retrieve his jacket. Contrel explained that when Mr. Harris arrived, he went outside and gave Mr. Harris his jacket. Contrel agreed that both Mr. Harris and Rickey seemed to be in an "okay mood" when they returned. Contrel turned around to walk back inside, but before Contrel could enter the house, he heard gunshots. During cross-examination, Contrel denied that Mr. Harris asked him if Mr. Hodges was still at the party when he called prior to returning to the party.

Doris, Contrel's mother, testified that on the night of the shooting, she was at Shontay's house attending a party for her daughters Shontay, who was turning thirty, and Contoyeria, who was turning eighteen. Doris explained that during the party, Contoyeria's friends left the backyard, where the party was located, and went into the front yard. When Doris went to check on them, she saw a group of people walking back toward the house. Doris told the group to stay in front of the house or to go into the backyard. Doris then noticed that Contrel had arrived at the party with Mr. Harris after having attended a talent show. Later, while the party was still in progress, Doris went back to the front yard after learning that Mr. Harris was arguing with someone. However, when she arrived, no one was arguing, but there were between fifteen to twenty people standing outside. She asked Mr. Harris what was upsetting him, but he responded that nothing was wrong. Doris explained that the only other person who looked upset was a male she knew as "Smiley" but that he also said that nothing was wrong. Soon thereafter, Mr. Harris retrieved his jacket from Contrel and told her that he was leaving. Mr. Harris and Rickey got into a car and began to leave. However, before the car reached the end of the street, Doris heard gunfire and shepherded the party-goers into the house. Doris

stated that she did not see the shooter but that she heard "a lot" of gunshots fired. Doris testified that the person she knew as "Smiley" was not appellant. During cross-examination, Doris testified that she was forty to fifty feet from the car when she heard the gunfire and that she did not see the shooting, only heard it.

Contoyeria testified that on the night of October 1 she was at a birthday party hosted in her and her sister's honor. She explained that both Mr. Hodges, whom her mother knew as "Smiley," and Mr. Harris were her boyfriends and that the two young men did not know about each other. Contoyeria explained that she invited Mr. Hodges to the party but that she did not know that Mr. Harris was planning to attend. Contoyeria stated that when Mr. Harris arrived at the party, she was "close" to Mr. Hodges, so she walked away from him. Mr. Harris hugged her, and she and Mr. Harris walked inside to get Mr. Harris some food. Contoyeria testified that the conflict began when Mr. Hodges walked down the driveway and saw her and Mr. Harris talking alone. At the time, Mr. Hodges was on the telephone arguing with someone. Contoyeria thought that Mr. Hodges was talking to his child's mother. One of Contoyeria's friends went and spoke to Mr. Hodges and, upon her return, told Contoyeria that she believed Mr. Hodges was angry with Contoyeria, not his child's mother. Contoyeria went down the street to talk to her friend and Mr. Hodges, and when she arrived, Mr. Hodges was asking someone on the telephone to come pick him up. Contoyeria told Mr. Hodges that her sister would take him home, and the three walked back to the house. Contoyeria stated that during the walk back, Mr. Hodges did not appear to be angry. Contoyeria explained that Mr. Harris left the party while she was speaking to Mr. Hodges and that appellant arrived at the party after Mr. Harris's departure. Contoyeria stated that before Mr. Harris left, she did not see him and Mr. Hodges have an argument and that she was unsure if Mr. Harris knew she was dating both him and Mr. Hodges simultaneously. She stated that Mr. Harris drove a blue Malibu. Contoyeria testified that while Mr. Harris was gone, she walked outside with Mr. Hodges and appellant but that she stopped and began talking to a friend. She asserted that no one seemed upset during that time. She saw Mr. Harris return to the party. Mr. Harris walked up the driveway and retrieved his jacket from her brother. Mr. Harris and Mr. Hodges then got into an argument, which she presumed was about her. During the argument, Mr. Hodges took his shirt off. Contoyeria's brother-in-law intervened in the argument before it escalated to a physical altercation. Mr. Harris returned to his vehicle and left the party. Mr. Hodges remained on the sidewalk. Contoyeria testified that as Mr. Harris was driving away, she heard gunshots. Contoyeria stated that she did not see the shooter or where the shots originated. After Contoyeria had gotten back into the house, Mr. Harris called her and told her that Rickey, who was in the car with him, had been shot. She "hung up on him" because she was crying and panicking. Contoyeria explained that the police arrived a few minutes later and that she told the police that Cordarious had perpetrated the shooting, even though she knew that was untrue. She asserted that she implicated Cordarious because he was the last person she saw walking "down there" but that she knew he was not the shooter. Contoyeria

explained that Mr. Hodges and appellant were "close" and that they referred to each other as brothers.

During cross-examination, Contoyeria agreed that she did not see the shooting, only heard the gunshots. She stated that she believed that Mr. Hodges was talking to his child's mother earlier in the night because that is to whom Mr. Hodges told her he was talking. Contoyeria testified that she was surprised when Mr. Harris returned to the party and that initially, she did not know why he had returned. Contoyeria agreed that she heard appellant tell Mr. Hodges "'[C]ome on[,] let's go'" prior to the argument.

Legarius Hodges testified that on October 1, 2011, he was dating Contoyeria and had been friends with appellant for approximately three to four years. He explained that he did not know Mr. Harris or know that Mr. Harris was also dating Contoyeria but that he went to school with Rickey. Mr. Hodges testified that he had dated Contoyeria in the ninth grade and that about one month prior to the party, they had rekindled their relationship. Mr. Hodges stated that on October 1, he walked to Contoyeria's party with several other people around 9:00 p.m. Approximately thirty minutes after Mr. Harris's arrival, someone at the party told Mr. Hodges about Mr. Harris and Contoyeria's relationship. Mr. Hodges explained that he first saw Mr. Harris and Contoyeria together when he walked into the front yard to talk on the telephone to his child's mother and saw the two of them standing under a tree "hugged up." He said that he was arguing with his child's mother when he saw Mr. Harris and Contoyeria and that he walked down the street to continue his conversation.

Mr. Hodges explained that he already knew about Mr. Harris and Contoyeria's relationship when he saw them and that although the situation made him angry, he did not say anything to them while he was on the telephone. Mr. Hodges continued to walk up the street, yelling and cursing at his child's mother, and at some point, other people joined him. Mr. Hodges then called appellant and asked appellant to come give him a ride home. He called appellant a second time to ask for appellant's location, and appellant asked if he was "running from something." Mr. Hodges assumed that appellant believed something was wrong due to the anger in his voice and because of the way he was speaking. Mr. Hodges denied asking appellant to bring a gun to the party and denied that he was seeking "backup for a fight." However, Mr. Hodges acknowledged that he had seen appellant with a gun in the past. Mr. Hodges testified that appellant arrived at his location but that he did not leave with appellant because Contoyeria told him about her relationship with Mr. Harris and repeatedly told him that her sister would drive him home. Mr. Hodges asserted that he did not tell appellant where the party was located and that after he told appellant that he was not leaving, he walked back to the party with the other party attendees. Mr. Hodges explained that appellant arrived in a "white kind of grayish" car and that appellant was not driving. Mr. Hodges stated that Desiree Ward

was driving the car but that he had only learned that fact after the shooting because he never looked at the other people inside the car.

Mr. Hodges explained that he did not see Mr. Harris when they returned to the party and that he and Contoyeria went into the house and sat "in the back room." While there, someone told Mr. Hodges that appellant had arrived, and Mr. Hodges went out the front door. After denying that he went outside to get appellant to leave, Mr. Hodges read part of his statement to police, in which he said that he was concerned about appellant's presence at the party because appellant was a "hothead" and that Mr. Hodges "didn't want him starting anything." Mr. Hodges initially stated that he had lied to the police when he made that statement; however, later in his testimony, Mr. Hodges agreed that the statement was true. When Mr. Hodges went outside to see if appellant was in attendance, Mr. Hodges saw Mr. Harris, and the two young men had a verbal altercation, during which Mr. Hodges removed his shirt. Mr. Hodges stated that a man, the owner of the property, intervened in the argument and told them to "go to the street." When Mr. Hodges walked down to the street, he saw appellant standing in the street, and Cordarious was attempting to calm the situation. Contoyeria's mother told Mr. Hodges not to fight, and Mr. Harris got into his blue car. Mr. Hodges testified that he and Contoyeria walked towards the house and that appellant was behind him by the curb. Mr. Hodges stated that appellant did not appear upset and that he and appellant did not have a conversation about what had occurred. Mr. Hodges testified that after Mr. Harris got in his car, he drove by yelling things about the fight not being over and demanding that the fight continue in a different location. Mr. Hodges believed that Mr. Harris was speaking to him and to appellant because appellant was Mr. Hodges' friend, but he did not turn around to see to whom Mr. Harris was speaking. Mr. Hodges explained that he then heard gunshots and that he turned around and saw appellant standing in the street shooting at Mr. Harris's car. Afterward, Mr. Hodges walked home with two other people. Mr. Hodges explained that approximately five minutes after the shooting, appellant called him and asked if he thought anyone saw appellant's actions. According to Mr. Hodges, appellant asked him to "make sure [appellant's] name stay[ed] out of it." When Mr. Hodges spoke to the police, he told officers that a male in a McDonald's uniform had committed the shooting, referring to Cordarious. Mr. Hodges agreed that his statement to police that appellant had fired about ten shots was true. Mr. Hodges testified that when he was on the street about to fight Mr. Harris, he showed appellant who both Mr. Harris and Rickey were.

During cross-examination, Mr. Hodges denied saying anything about having a surprise for someone. Mr. Hodges denied telling appellant that he was "into it" with "some guys," that the men were "strapped," or that he asked appellant to bring a "strap." Mr. Hodges testified that he did not leave when appellant arrived because Contoyeria wanted to talk to him about her relationship with Mr. Harris. Mr. Hodges stated that when appellant arrived at the party, he did not try to start a fight with anyone and that appellant appeared calm. Mr. Hodges testified that when Mr. Harris began yelling out of

his car while he was driving away, he did not hear appellant respond. During re-direct examination, Mr. Hodges agreed that in his police statements, he never mentioned Mr. Harris's yelling after he had entered his car.

Desiree Ward testified that on the evening of October 1, 2011, she was at a club called Third World with appellant, "Queisha," "Quita," "Shecanna," and "Antonio." Ms. Ward testified that Mr. Hodges called appellant multiple times asking appellant to attend a party and that appellant asked her to drive him to the party. Ms. Ward testified that she drove her silver Mercury directly to the party and that appellant had informed her of the party's location. When they arrived, Ms. Ward remained in the car while appellant and Mr. Hodges had an altercation with "some dudes." Ms. Ward heard appellant telling the "dudes" to go around the corner and "get the one on one with [Mr. Hodges]." Ms. Ward stated that during the altercation, a woman approached her and told her to "get [appellant] and quit disrespecting her house." Due to this conversation, Ms. Ward asked appellant to leave. Ms. Ward testified that after the altercation ended, appellant got into her car and that Mr. Hodges was standing outside of her car. Ms. Ward explained that appellant did not seem angry and denied knowing that appellant was armed. While the woman was still talking to Ms. Ward, a car drove past, and Mr. Hodges said, "'[T]here them n*****s go right there.'" Appellant got out of the car and ran, although Ms. Ward was unable to see in what direction he ran. Ms. Ward said that Mr. Hodges went with appellant. A "couple of seconds later," Ms. Ward heard gunfire. Ms. Ward said that she began to leave and that appellant ran to the car and got inside. Ms. Ward believed that he was merely running from the gunshots. Ms. Ward described appellant's behavior as normal and stated that appellant did not say much about the incident.

Cordarious testified that in October 2011, he was sixteen years old and that he knew both Mr. Harris and appellant. On the night of the shooting, he was at work at McDonald's with "Leon," "D.J.," and "Bam." When the four of them left work, they went to Cordarious' house. Cordarious explained that Mr. Harris called him and asked him to go to a party because Mr. Harris had left something at the party and there were "some guys" that Mr. Harris had "got into it with." After Cordarious agreed to go to the party, he, Mr. Harris, Rickey, and "Leon" went to the party in Mr. Harris's car, and "Bam" and "D.J." went to the party in a burgundy Ford Taurus. When they arrived at the party, Mr. Harris got out of the car, and when he was coming back out of the house, Mr. Harris had a verbal altercation with Mr. Hodges, whom Cordarious only knew as "L.G." Cordarious got out of the car when he saw the argument taking place, and he attempted to calm the situation. He said that he saw appellant and that he asked appellant what was causing the altercation. Appellant responded that Mr. Hodges was "'into it'" with Mr. Harris over "'a female.'" Appellant and Cordarious walked up the street, and appellant stated, "'[M]an, if he come[sic] down here and say[sic] anything else to me[,] I'm going to shoot him.'" Cordarious explained that he attempted to calm appellant because appellant was getting angry with Mr. Hodges. During this time, Cordarious saw that

appellant had a gun. Cordarious testified that while he and appellant were walking down the street, Mr. Harris returned to his car. When Mr. Harris drove by Cordarious and appellant, Mr. Harris said something, although Cordarious could not remember the exact words, to appellant. Appellant responded by telling Mr. Harris to "[c]ome around the corner," and then appellant began shooting at Mr. Harris's car. Cordarious testified that Mr. Harris tried to turn at the corner and that appellant started following the car while still shooting. Cordarious said that he got into the car with "Bam," "D.J.," and "Leon" and that appellant got into a silver car.

During cross-examination, Cordarious agreed that he told police that when Mr. Harris called him about attending the party, Mr. Harris told him that someone at the party tried to "jump" Mr. Harris. Cordarious testified that when he saw appellant during the altercation, appellant was attempting to calm everyone down. Cordarious agreed that appellant was angry with Mr. Hodges because he wanted Mr. Hodges to leave the party. Cordarious stated that Mr. Harris could have yelled, "[B]ro[,] do you want to jack" at appellant. During re-direct, Cordarious agreed that wanting to "jack" means wanting to engage in a fist fight. Cordarious testified that appellant chased Mr. Harris's vehicle almost to the end of the street.

John Stone, an officer with the Memphis Police Department Crime Scene Investigation Unit, testified that on the night of October 1, 2011, he was called to investigate two related crime scenes — at one there were multiple shell casings on the ground ("the first scene") and at the other scene, about one-half of a mile from the first scene, there was a vehicle with a victim inside the car ("the second scene"). Officer Stone explained that his sole job was to preserve evidence from the crime scenes. Officer Stone described the first scene as a "war zone" because there were shell casings "everywhere." Officer Stone testified that he found twelve shell casings and one bullet fragment spanning over a fifty-five-foot area. He opined that all of the shell casings were fired from a nine-millimeter gun.[2] After processing the first scene, Officer Stone proceeded to the second scene. Officer Stone observed a four-door blue car that had multiple "possible bullet holes and bullet strikes" on it, and there was a deceased victim in the passenger seat of the car. Officer Stone explained that the car's windows were broken and that there was blood inside the car. There was also a bloody, white t-shirt lying behind the vehicle. Regarding a picture of the windshield, Officer Stone testified that the glass "bowed in a little bit," indicating that the bullet was entering the car, rather than being fired from within the car. Among the damage to the car, there were bullet holes in the windows, right rear reverse light, left rear passenger door, and left front fender. Officer Stone estimated that he observed approximately ten bullet holes in the

---

[2] Because appellant has not challenged chain of custody on appeal, our summary of the facts will not include testimony in that regard.

car.  The photographs that Officer Stone took at the two crime scenes were entered as exhibits at trial.

David Galloway, an officer with the Memphis Police Department Crime Scene Investigation Unit, testified that he was assigned to process a blue Chevrolet Malibu that had been involved in a shooting.  The car was brought to the crime scene office and processed there.  Officer Galloway testified that the car had what appeared to be blood and nine bullet holes in it and that several windows were either missing or had bullet holes in them.  Officer Galloway also found a bullet fragment and a "spent bullet," which he described as a bullet that had been fired, in the car.  He found no weapons in the car.

Memphis Police Department Lieutenant Robert Scroggins testified that while he observed, another officer questioned appellant regarding the October shooting.[3]  During the statement, appellant accused Cordarious of committing the shooting, stating that Cordarious shot into the driver's side of the car and then ran after the car.  Appellant also identified Cordarious in a photographic lineup.

Memphis Police Department Sergeant Michael Brown testified that he interviewed appellant a second time due to another witness's identifying appellant as the shooter.  During the interview, appellant stated that he had been untruthful in his prior interview and that he wanted to correct his statement.  Appellant admitted that he was responsible for Rickey's death.  Appellant stated that on the night of the shooting, Mr. Hodges called him and told him that Mr. Hodges was "'into it with somebody and to bring a strap.'"  Appellant explained that when he arrived, Mr. Hodges indicated that the males that he was "'into it with'" drove the blue Malibu and that after Mr. Hodges' altercation with another male, Mr. Hodges' opponent entered the blue Malibu.  Appellant explained that the blue car began "creeping" by him and that he began shooting into the driver's side of the car.  When the car drove away, appellant ran after the car, shooting at the back of it.  Appellant stated that his weapon was a nine-millimeter handgun and that after the shooting, he hid the gun under a piece of wood next door to his home.  Appellant explained that he shot at the car because he "'[t]hought they had something too and [he] was trying to scare them.'"

Memphis Police Department Officer J.R. Rector testified that in October 2011, he worked for the Crime Scene Investigations Unit and that he was asked to retrieve a weapon from a vacant field.  Officer Rector explained that he went to the designated location and found a handgun beneath a piece of wood.

---

[3] Because appellant has not challenged the propriety of his interviews, we have omitted all testimony regarding interview procedure and consent to the interviews, instead only including the key information from the interviews.

Eric Warren, a special agent forensic scientist with the Tennessee Bureau of Investigation, testified that he performed a firearm analysis on a nine-millimeter handgun. Special Agent Warren testified that the handgun could hold up to thirteen bullets and that the bullet casings would have ejected from the gun each time it was fired. Special Agent Warren explained that he analyzed the gun and shell casings and bullets recovered from the scene and the deceased victim. He opined that the nine-millimeter gun fired all of the shell casings and bullets recovered, although due to a lack of "class characteristics," he was unable to determine from which gun the bullet fragment had been fired.

Marco Ross, a forensic pathologist and the Deputy Chief Medical Examiner at the Shelby County Medical Examiner's Office, testified that on October 2, 2011, he performed an autopsy on the body of Rickey Mayes. Doctor Ross determined that Rickey died from a gunshot wound to the head and arm. The bullet entered the left side of the back of his head and exited on the right side of his head. Doctor Ross determined that the gunshot perforated and passed through both sides of Rickey's brain. Rickey also had two other gunshot wounds — one on his right forearm, in which the bullet entered his right forearm and exited near the crook of his arm, and the other was a "gunshot graze wound" on his left thumb. There was also another "possible graze wound" on Rickey's left upper arm, but Doctor Ross could not definitively determine that the injury was a gunshot wound. Doctor Ross recovered two bullets during his examination. Rickey had no drugs or alcohol in his system. Following this testimony, the State rested its case-in-chief.

Appellant testified in his own defense that in October 2011, he was eighteen years old and that Mr. Hodges was a close friend, like a brother. Appellant explained that on the night of October 1, 2011, he was outside of a club when Mr. Hodges called him and asked him to come to a party and bring a "strap." Appellant stated that he went to the party and that his intention was to get Mr. Hodges away from any danger. Ms. Ward drove appellant and three other people to the party. Before arriving at the party, appellant stopped nearby where Mr. Hodges was standing with a small group of people. Appellant described Mr. Hodges as "a little hot, a little mad." Appellant explained that he attempted to convince Mr. Hodges to leave but that Mr. Hodges' girlfriend asked Mr. Hodges to stay and told Mr. Hodges that her sister would drive Mr. Hodges home. Mr. Hodges returned to the party. Appellant followed the group back to the party, spoke to several people that he knew, and again asked Mr. Hodges to leave. Appellant explained that before he could get Mr. Hodges to leave, Mr. Harris arrived, and Mr. Hodges and Mr. Harris began to argue. Appellant intervened and asked if Mr. Harris wanted to fight Mr. Hodges, to which Mr. Harris responded negatively, stating that he did not even know Mr. Hodges. Mr. Harris and Mr. Hodges continued to argue, and appellant realized that the argument concerned a girl, which appellant characterized as "crazy." Appellant again tried to get Mr. Hodges to leave the party. Appellant testified that Cordarious approached

-11-

him and told him to calm down and that he told Cordarious that he was calm. Appellant stated that at this point, he was not angry with either Mr. Harris or Rickey. Appellant explained that he walked away from the party and that he was calling one of the people with whom he had arrived to come pick him up when he looked up and saw a car "creeping up on [him]" with the headlights off and someone in a white t-shirt "hanging out" of the passenger-side window. Appellant explained that based on his experiences in North Memphis, if someone was "hanging out" of a car window, it indicated that a drive-by shooting was about to occur. Appellant testified that because of this experience, he began shooting at the car even though he did not see a gun because he panicked. Appellant asserted that his intent was to "scare the car off" and that he was not chasing the car but fleeing the scene as he was shooting.

Appellant stated that Ms. Ward's testimony that he got out of her car and chased the car was untrue and that Cordarious' testimony that Cordarious was walking down the street with appellant while appellant made threatening statements was untrue. Appellant explained that he initially lied to the police about the shooting because the officers "scared" him when they implied that he was trying to "cover" for Cordarious when he told them that Cordarious was not the shooter. Appellant testified that he told the truth in his second interview. Appellant admitted that the shots he fired killed Rickey and stated that he was sorry for telling the police that Cordarious was the shooter and that he was sorry that Rickey was dead.

During cross-examination, appellant stated that at the time of the shooting, he had been carrying a gun for a "couple of months" and that he bought the gun from "a crack head." Appellant explained that he carried the gun because he had been "jumped numerous times." Appellant also agreed that Mr. Hodges did not invite him to the party after they had talked on the street. Appellant stated that Mr. Harris was the "guy in the white shirt." Appellant asserted that during the argument between Mr. Hodges and Mr. Harris, he was "fine" and that he was not upset. Appellant stated that the person he saw "hanging out" of the car was in the front, passenger window. Appellant testified that he could not recall telling the police during his first statement that Cordarious chased after the car while shooting. Appellant agreed that after the shooting, he got into Ms. Ward's car and that he went to an apartment and "hung out." Appellant denied telling Mr. Hodges to "keep [his] name out of it" and denied telling Mr. Hodges to implicate Cordarious. Appellant testified that Mr. Hodges, Cordarious, and Ms. Ward did not have a reason to lie about the night of the shooting. Appellant testified that no one in the car said anything to him before he began shooting. Appellant asserted that he identified Cordarious as the shooter because the police officers told him that if he did not, he would be charged with murder.

Following this testimony, the jury convicted appellant of first degree murder and attempted first degree murder. The trial court sentenced appellant to life for his first

degree murder conviction and to fifteen years for his attempted first degree murder conviction, to be served concurrently. Appellant now appeals his convictions.

## II. Analysis

Appellant argues that the evidence at trial was insufficient to support his convictions. Specifically, he argues that there was insufficient evidence of premeditation. Appellant also argues that the trial court erred in issuing a supplemental jury instruction regarding the element of premeditation. The State responds that there was sufficient evidence to support appellant's convictions. The State also argues that appellant has waived his objection to the supplemental jury instruction or that, alternatively, the trial court properly instructed the jury.

## A. Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts

from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The jury convicted appellant of premeditated murder and attempted premeditated murder. Tennessee Code Annotated section 39-13-202(a) defines this category of first degree murder as "[a] premeditated and intentional killing of another."

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(d). In reviewing the sufficiency of the evidence, we must determine whether the State established the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). The presence of premeditation is a question of fact for the jury, and the jury may infer premeditation from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998). A defendant's "state of mind is crucial to the establishment of the elements of the offense," thus, the State may prove premeditation by circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

Appellant was also charged and convicted of attempted first degree murder.

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(3). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b).

Appellant specifically challenges the sufficiency of the evidence showing premeditation. Several factors support the existence of premeditation including: "'[d]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.'" *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005) (quoting *State v. Nichols,* 24 S.W.3d 297, 302 (Tenn. 2000)).

Viewed in the light most favorable to the State, the evidence at trial showed that appellant killed Rickey Mayes and attempted to kill Tarin Harris in an intentional and premeditated manner. First, appellant made a declaration of an intent to kill when he told Cordarious, "'[M]an, if he come[sic] down here and say[sic] anything else to me[,] I'm going to shoot him.'" Second, we note that Mr. Hodges specifically told appellant to bring a "strap" to the party because of an altercation. This indicates that appellant took his gun to the party knowing that he might use it. Third, appellant used a deadly weapon upon two unarmed victims. Appellant admitted that he never saw either of the victims with a gun, and no weapons were found in the victims' possession after the shooting. Fourth, appellant shot Rickey in the head, arm, and thumb and shot Mr. Harris twice. Therefore, there was evidence that appellant inflicted multiple wounds upon the victims. Fifth, appellant acknowledged that he hid the nine-millimeter handgun under a piece of wood subsequent to the shooting, and officers found the weapon in the designated location. Therefore, there was evidence that appellant secreted evidence of the murder. Finally, calmness after a killing is indicative of premeditation. Ms. Ward testified that when appellant got into her car after the shooting, he seemed normal and that he did not say much about the shooting. Based on this evidence, there was sufficient evidence of premeditation to support both appellant's first degree murder conviction and his attempted first degree murder conviction. Appellant is without relief as to this issue.

## B. Supplemental Jury Instruction

Appellant also argues that the trial court erred in issuing a supplemental jury instruction regarding the element of premeditation. Appellant specifically challenges the first sentence of the supplemental jury instruction, which stated, "When considering element three, that the killing was premeditated, each act engaged in by the defendant may be considered in determining whether or not the act of killing was premeditated." Appellant argues that in making this statement, the trial court inappropriately commented on the facts of the case and that the instruction was incomplete because the court failed to instruct the jury that "evidence of multiple gunshots alone [is] not sufficient to establish premeditation."

Initially, we must determine if this issue has been properly preserved on appeal. First, we address whether appellant lodged a contemporaneous objection at trial. During jury deliberations, the jury asked the trial court, "Does each shot constitute a separate act when considering premeditation?" During the discussion about the proper supplemental jury instruction, the following colloquy took place:

> THE COURT: So we have now the following jury answer: "When considering element three, that the killing was premeditated, each act engaged in by the defendant may be considered in determining whether or not the act of killing was premeditated. The question for the jury is not whether the act of a particular shot was premeditated, but whether or not the State has proven, beyond a reasonable doubt, that the act of killing was premeditated." The good thing about that is, it allows the jury to consider all the shots, but it also tells them that the State has to prove beyond a reasonable doubt that the act of killing was premeditated. Of course, I can't tell the jury which shot was the one that killed, but that still leaves it up to the jury, but I think that is an appropriate law. [Defense Counsel]?
>
> [Defense Counsel]: I'm sorry?
>
> THE COURT: I said that I think that that is appropriate under the circumstances unless you have an objection?
>
> [Defense Counsel]: Just one more moment, sir.
>
> . . . .
>
> [Defense Counsel]: Your Honor has already voiced what you think about it, but to me, and it is late in the day, so maybe I am not thinking this through, but to me it just basically makes it – what is it is helping with the State's argument that because there was more than one, one more and more and more and more, that made it premeditated.
>
> THE COURT: And I think that's the law.
>
> [Prosecutor]: That is the law.
>
> THE COURT: That repeated shots, or something, I think – our Appellate Courts say that they can consider that in deciding whether or not there is sufficient proof under <u>Jackson versus Virginia</u>. So in a way, that is the law, of course, it is up to the jury to decide when premeditation was formed.

-16-

[Defense Counsel]: Right.

THE COURT: And if there is a question in this case of whether it started to be formed half way through, that he started to scare the guy, but the more he thought about it, you know. The difficult question for the jury here though is, which shot, you know which shot killed him and of course the medical examiner could not testify to that, he testified that he couldn't tell.

[Defense Counsel]: Well, that really does make sense, particularly given the language that we continue with, whether or not the State has proven beyond a reasonable doubt that the act of killing is premeditated, I can see that.

THE COURT: So I think that both sides get a little here. All right. Bring in the jury, please.

Following this discussion, the trial court submitted the proposed jury instruction to the jury for consideration.

On appeal, appellant argues that defense counsel's statements during this discussion amounted to an objection to the supplemental jury instruction. However, the State asserts that appellant failed to object to this issue at trial. We agree with the State. Defense counsel's statements amounted to mere discussion about the propriety of the instruction and then agreement with the final outcome. Tennessee Rule of Appellate Procedure 36(a) states, "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Therefore, generally, when a party assents to an issue at trial, as here, the issue is considered waived on appeal.

Second, we address whether appellant properly preserved this issue in his motion for new trial. In his motion for new trial, appellant simply stated that "the Court erred in its supplemental jury instruction upon a question by the jury regarding the number of shots being indicative of premeditation." In this regard, at the motion for new trial hearing, defense counsel argued:

As evidence of premeditation and there was a lengthy discussion. Your Honor proposed one potential response and [the prosecutor] persistently gave you alternatives of which one to pick and we are just asserting Judge that that was error that was basically emphasized, even though there was discussion at that time about that was the law.

-17-

I would just raise the issue that it unnecessarily emphasized that part of the State's case and that is it, I'll just submit it on that basis.

In response to this argument, the trial court denied appellant's motion for new trial, stating that the supplemental jury instruction was a correct statement of the law.

Regarding appellant's argument on appeal that the jury instruction was incomplete, we conclude that appellant raised this issue for the first time on appeal; therefore, this issue is waived. Appellant did not contemporaneously object to the supplemental jury instruction in this regard, and appellant failed to make this argument in his motion for new trial, instead arguing that the supplemental jury instruction emphasized the State's case regarding the number of gunshots appellant fired. It is well-settled law that an appellant cannot raise an issue for the first time on appeal nor can he change his arguments on appeal. *See Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983) (stating that it "has long been the general rule that questions not raised in the trial court will not be entertained on appeal"); *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. 1988) ("It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this Court."). Furthermore, our supreme court has stated that an incomplete jury instruction must be objected to at trial or the issue is deemed waived, as opposed to an incorrect jury instruction that can be raised for the first time in the motion for new trial. *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007) (citations omitted); *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citations omitted). Therefore, appellant has waived his argument that the jury instruction was an incomplete statement of the law.

Regarding appellant's argument that the trial court inappropriately commented on the facts of the case by emphasizing the State's arguments regarding the number of gunshots fired, even if we concluded that appellant had properly lodged a contemporaneous objection at trial, appellant is still not entitled to relief based on the merits of the argument.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011) (citations omitted). It is the duty of the trial judge to properly instruct the jury as to the law governing the issues fairly raised by the evidence introduced at trial and the nature of the proceedings. *Id.* (quoting *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Trial courts have the authority to answer jury questions through the use of a supplemental jury instruction. *State v. Forbes,* 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995) (citing *State v. Moore,* 751 S.W.2d 464, 467 (Tenn. Crim. App. 1988)). However, when a trial court instructs the jury in this regard, the court is specifically prohibited from

charging juries "with respect to matters of fact, but may state the testimony and declare the law." Tenn. Const. art. VI, §9. "A trial court must be 'very careful not to give the jury any impression as to [its] feelings' or 'make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury.'" *State v. David Richardson*, No. W2013-01763-CCA-R3-CD, 2014 WL 6491066, at \*11 (Tenn. Crim. App. Nov. 20, 2014) (quoting *State v. Suttles,* 767 S.W.2d 403, 407 (Tenn. 1989)). On appeal, this court must determine if a given instruction is prejudicially erroneous, which occurs when the instruction "fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Vann,* 976 S.W.2d 93, 101 (Tenn. 1998) (citations omitted). The propriety of a given instruction is a mixed question of law and fact that we review de novo with no presumption of correctness. *State v. Smiley,* 38 S.W.3d 521, 524 (Tenn. 2001).

In response to a jury question, the trial court instructed the jury as follows:

When considering element three, that the killing was premeditated, each act engaged in by the defendant may be considered in determining whether or not the act of killing was premeditated. The question for the jury is not whether the act of a particular shot was premeditated, but whether or not the State has proven, beyond a reasonable doubt, that the act of killing was premeditated.

We conclude that the trial court did not err in giving the supplemental instruction to the jury. Unlike the court in *State v. Hollis*, in which the court directed the jurors' attention to several specific factual factors they could consider in determining if an act was premeditated, the trial court directed the jury's attention away from the specific factual acts of each shot appellant fired, instead directing the jury to consider whether the evidence as a whole proved that appellant's actions were premeditated. *See State v. Hollis*, 342 S.W.3d 43, 49-52 (Tenn. Crim. App. 2001). In doing so, the trial court specifically directed the jury to the evidence as a whole by stating that the jury could consider "each act engaged in by the defendant," not each shot the defendant fired, and by stating that the critical question was "whether or not the State has proven, beyond a reasonable doubt, that the act of killing was premeditated," not whether each shot was premeditated. Therefore, the trial court did not improperly comment on the evidence. Appellant is not entitled to relief.

## CONCLUSION

Based on the parties' briefs, the record, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE